UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 20-CR-10098-WGY |
| | ) | |
| | ) | |
| STEPHANIE POPP, | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant | ) | |

<u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>

On October 8, 2020, defendant Stephanie Popp pleaded guilty to each count in an Information charging her with conspiracy to commit cyberstalking, contrary to 18 U.S.C. § 2261A(2) and in violation of 18 U.S.C. § 371 (Count 1), and witness tampering conspiracy, contrary to 18 U.S.C. § 1512(b)(3) and in violation of 18 U.S.C. § 371 (Count 2).  The Probation Office's Presentence Investigation Report[1] assigns Popp to a total offense level of 24 and a Criminal History Category of I.  (¶¶ 164, 168).  The corresponding guidelines sentencing range ("GSR") is 51 to 63 months.  (¶ 207).  The United States agreed in a plea agreement with Popp to recommend not more than 41 months' imprisonment.  (Docket No. 43).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ after evaluating the factors set forth at 18 U.S.C. § 3553(a), the government requests that the Court sentence Popp to serve 1

---

[1] Citations to Popp's Presentence Investigation Report (or PSR) appear below as "¶ __."

year and 1 day in custody, with one year of supervised release to follow, and to pay a $200 special assessment.

## I.      The Offense

In August 2019, Popp was 31 years old.  She was the Senior Manager of Global Intelligence at eBay, reporting to Jim Baugh—the company's senior security employee.  Popp had worked with Baugh in corporate security in the Seattle area.  She joined Baugh at eBay in February 2017, working in (and then managing) eBay's Global Intelligence Center ("GIC"), an intelligence and analytics group that supported eBay's security operations.  (¶ 7c).

Victims 1 and 2—wife and husband—lived in Natick.  They were the reporter and publisher, respectively, of an online newsletter ("the Newsletter") that covered ecommerce companies, including eBay.  (¶¶ 8-9).  Members of eBay's Executive Leadership Team, including the company's CEO and its Chief Communications Officer ("CCO"), were frustrated with both the Newsletter's reporting and with "Fidomaster", an online persona who was critical of eBay and the CEO in particular.  (¶¶ 26, 31).

By June 2019, Baugh was frustrated enough with the Victims to place a late-night "hang-up" phone call to them (¶ 23), and to dispatch to Natick a former Santa Clara Police Department captain who was a member of his security team, co-defendant Brian Gilbert.  Late at night on June 8, 2019, Gilbert scrawled "Fidomaster" in permanent marker on the Victims' fence.  (¶ 22).  In June and July 2019, Baugh tasked co-defendants Stephanie Stockwell and Veronica Zea, GIC analysts, with monitoring the Newsletter's posts in real time, 24 hours per day, and forwarding them to Baugh.  (¶ 24).  In late July 2019, believing that Fidomaster or the Victims would be traveling to Las Vegas for an eBay seller conference, Baugh sent Zea and Gilbert to the airport to film all of the arriving passengers deplaning from a particular flight.  (¶ 25).

*The Harassment and Intimidation Campaign*

In August 2019, after Victim 1 reported in the Newsletter on a lawsuit between eBay and Amazon, the CEO sent the CCO a text message suggesting that it was time to "take [Victim 1] down".  The CCO immediately sent Baugh the same text message, and another labeling Victim 1 a "biased troll who needs to get BURNED DOWN".  (¶ 26).  In response, Baugh weaponized eBay's security department, targeting Victims 1 and 2 with a three-part harassment and intimidation campaign.  (¶¶ 27-83).  As indicated below, Popp had a significant role in (or detailed awareness of) every aspect of the campaign.

On August 7, 2019, at Baugh's direction, Victim 1 began to get anonymous, harassing messages on her Twitter account.  (¶ 32).  The messages, which featured a skeleton mask intended to scare Victim 1, criticized the Newsletter's coverage of eBay ("What's your problem with eBay?  You know that's how we pay rent."); were frequently vulgar ("Stop hiding behind ur computer screen u fucking cunt"); and at times threatened violence ("wen u hurt our bizness u hurt our familiys…Ppl will do ANYTHING 2 protect family!!!!").  (¶¶ 30, 32, 35, 50).

Popp sent all of the messages.  Baugh generally directed their timing and content.  Gilbert drafted them and shared them by WhatsApp (the encrypted messaging application) with Cooke, Baugh and Popp sometimes receiving input in response.  (¶ 32 n.1).  As one example of this process, on August 20, 2019, Gilbert proposed to the group introducing new anonymous accounts that would harass Victim 1.  Popp responded to ask whether the new account should have a "Samoan name as well," to create the impression that it was related to the first harassing account.  Gilbert suggested vulgar content ("I don't want to see another fucking post about ebay") and that the group publish Victim 1's home address alongside the statement "I guess I have to pay her a visit", to which Popp and Cooke each responded:  "Copy all".  (¶¶ 74-76).

At the same time, again at Baugh's direction, the Victims also began to receive anonymous deliveries at their home.  Some were gross, such as fly larvae, cockroaches, and spiders.  (¶¶ 36, 49).  Others were embarrassing, including pornography addressed to Victim 2 at his neighbors' homes.  (¶ 37).  The most concerning of them were threatening—a funeral wreath and a book entitled Surviving the Loss of a Spouse.  (¶¶ 45, 48).

Baugh directed these deliveries by WhatsApp.  For example, on August 12, 2019, he messaged Popp, Stockwell, Zea, and others:

> Starting now through Tuesday night double our effort on everything.  Spam, house deliveries, etc.  I don't want anything delivered on Thursday, so the cutoff should be Wednesday night – wake them up with a limo driver or something and then everything goes cold Thursday morning. … Take down all Craigslist posts late Wednesday night.  Stop Spam late Wednesday night.  etc.

(¶ 44).

The Craigslist posts that Baugh referenced included online advertisements for consensual sexual encounters at the Victims' home.  (¶ 71).  The group's messages also made clear that the Victims' antagonist was responsible for the harassing deliveries.  (¶ 70) ("U get my gifts cunt!!??").

Victim 1's email inbox also began to overflow with dozens of bizarre emails from, among other groups: an Irritable Bowel Syndrome patient support group; Scientology Today; The Satanic Table; the Communist Party of the United States, a sex and relationship coaching website, the Submissive Guide, and Adam & Eve, an adult products website.  Victim 2 later received a phone call from Adam & Eve responding to his purported interest in a sex toys franchise—an interest he had never expressed.  (¶ 34).

Baugh planned these threatening messages and deliveries in meetings with eBay employees and contractors who reported to him, including Popp.  (¶¶ 27-28).  He directed them

to use prepaid debit cards, disguises, overseas email accounts, WhatsApp (instead of eBay's email network), non-eBay computers, and Virtual Private Networks—all to assure that the campaign could not be traced back to him, to his coconspirators, or to eBay.  (¶¶ 13, 29, 33, 36). He directed Stockwell, for example, to purchase a laptop computer at a San Jose area Best Buy, which Popp used to send out the harassing messages.  (¶ 29).

On August 11, 2019, Baugh recruited Dave Harville—eBay's Director of Global Resiliency—to travel with him (and Zea) to Boston on a surveillance "op" targeting Victim 1 and the Newsletter.  Baugh made the illegal purpose of the trip clear, telling Harville that Baugh had been ordered to "find and destroy", and to "neutralize" Victim 1's website.  Harville acknowledged: "Copy.  Totally black[.]  I'm deleting this now."  (¶¶ 42-43).  Baugh, Harville and Zea needed an alibi for the trip—a software development conference taking place in Boston. They also took with them an eBay document (prepared by Stockwell at Baugh's direction) that falsely identified the Victims as a security threat—"in case we got stopped..that way would at least have something to show to PD".  (¶¶ 52, 59, 80).

On August 15, 2019, Baugh, Harville, and Zea traveled to Boston.  (¶ 55).  Before doing so, Harville obtained the Victims' license plate number from Stockwell (¶ 56) and downloaded an app to his phone that could be used to monitor the "Natick Police and Fire Live Audio Feed". (¶ 54).  Upon arriving, Baugh, Harville, and Zea went right to the Victims' home:  once late at night on August 15 in a failed attempt to install a GPS device on the Victims' car—it was locked in the garage—and again on August 16 to surveil the Victims and to follow Victim 2 as he drove in Natick.  (¶¶ 57, 61, 63).  Popp participated in these surveillances by monitoring the Natick Police's dispatch and communicating with the surveillance team over a conference line.  (¶ 58). Harville later purchased equipment at a local hardware store to break into the Victims' garage.

(¶ 60).

After failing to install the GPS device, Baugh, Harville, and Zea returned to their hotel's bar, where Baugh and Harville joked about what else could be delivered to the Victims, including a bag of human feces, a running chainsaw, and a rat.  Baugh also called Stockwell (back in California) and directed her to resume the harassing deliveries, even though Baugh already knew the Victims were terrified.  (¶¶ 65-66).

Popp flew to Boston to replace Harville on the surveillance team on August 17, 2019. (¶ 68).  In Boston, she continued to send harassing and intimidating messages, including by posting publicly on Twitter Victim 1's name, age, address, and telephone number.  (¶ 69).  When Twitter suspended the account Popp had created, she created a second to continue harassing the Victims.  (¶ 81).  She participated in two surveillances, including one in which Victim 2 was able to take a picture of the surveillance team's license plate.  (¶ 72).

Popp—along with Gilbert, Baugh, and Cooke—appreciated the impact that the campaign was having on the Victims.  On August 20, 2019, Popp sent to Gilbert, Cook, and Baugh a recording of a Natick Police Department dispatch detailing the August 16 surveillance.  Baugh replied that the group had "burned" two surveillance cars and that the Victims were "seeing ghosts right now".  (¶ 78).[2]  Baugh also shared with the same group an excerpt from the movie *Old School*, in which a character announces at a stranger's front door that he has arrived for a "gang bang".  Baugh noted "this has been the [Victims'] house for the past 5 nights."  (¶ 79).

In the wake of the failed surveillance attempts, Baugh summoned two GIC employees, Analyst 1 and Analyst 2, to support the harassment campaign and to obstruct the police

---

[2] Baugh separately quipped to Stockwell and another GIC analyst, "now they are seeing ghosts, think everyone is following them and they call the police every 10 minutes".

investigation.  Analyst 1 quit; Baugh fired Analyst 2 when she refused to travel.  (¶ 73).

*The Obstruction*

By August 21, 2019, the Natick Police Department ("NPD") had connected Zea and Harville to the surveillance.  An NPD detective went to the lobby of Boston's Ritz Carlton Hotel to interview Zea.  Baugh spoke to the detective by phone, falsely claimed to be Zea's husband, and (in Baugh's words) "played dumb".  (¶ 84).  In response, the detective reached out to eBay for help investigating the harassment of the Victims.

Within three minutes of learning of the police investigation, Popp instructed Zea to take down her LinkedIn account, which could have connected Zea to eBay.  (¶ 86).  Within an hour, at Baugh's direction, Popp posted more threatening messages about Victim 1 (¶ 91) and then sent screenshots of those messages over her eBay email account to Baugh and Gilbert, writing falsely that Victim 1 was "really bringing out some angry Twitter users"—all to distance herself and her co-conspirators from the harassment.  (¶ 92)

Gilbert then called the Victims offering help (without disclosing eBay's involvement in the harassment).  Gilbert reported back to Baugh, Popp, and Cooke that the Victims were "totally rattled".  (¶ 95).  Baugh then sent Gilbert (the retired police captain) all the way from California to Natick to meet with the NPD, and to report (falsely) that eBay was investigating the harassment of the Victims, not participating in it.  (¶ 112).  To support this ruse, Baugh directed Popp to post more Twitter messages threatening the Victims.  (¶ 91, 105, 113).

After learning that the NPD was investigating the use of a prepaid debit card in the Bay Area to purchase one of the harassing deliveries to the Victims, Baugh directed Popp and then Zea to "find a local [Person of Interest]" who could be used to deflect police attention from Zea (the co-conspirator who had used the card).  (¶¶ 98-99).  Stockwell created the document, "Bay

7

Area POIs_August 2019.docx," and emailed it to Baugh, who passed it along to Gilbert to provide to the NPD. (¶ 101). Zea, of course, was not listed.

Baugh, Gilbert, Popp, and Cooke were also aware that eBay was attempting to gather information in response to the NPD's request for assistance. (¶ 104). Armed with this knowledge, on August 26, 2019, Baugh directed Harville, Popp, Gilbert, and Zea to keep their phones "clean" (*i.e.*, to delete evidence concerning the harassment of the Victims and the surveillance operation in Natick, including WhatsApp messages). (¶ 121). Baugh also sent Popp to sit in on telephone interviews of Stockwell and Zea (without disclosing that Popp was in the room listening to the questions), so that Popp could give visual cues as to how Stockwell and Zea might best answer the questions. (¶ 120). Baugh, Harville, and Zea also sent to eBay's lawyers an altered email related to the software development conference—the alibi conference—so that their purported registration fit better the timeline of their travel. (¶ 119).

In September 2019, aware of both the police and eBay investigations, Popp made more posts to social media accounts that had been used to harass the Victims, to suggest to investigators that those responsible for harassing the Victims were still at large. (¶ 129).

Baugh's obstruction continued past October 2019, when the government sent him, Stockwell, and several other co-conspirators target letters. Baugh manipulated Stockwell, by starting to have sex with her in the wake of the harassment campaign, and by paying her $5,000 in cash just before her proffer with federal investigators—a purported gift that she should not deposit all at once because it might cause trouble with the government. Baugh also "prepared" Stockwell for the meeting by suggesting she only discuss what she had seen personally (which was nothing in Boston or Natick). He also instructed Stockwell to lie about the nature of her relationship with Baugh because it would not reflect well on her (which she then did). Baugh

ended the relationship almost immediately after the proffer.  (¶¶ 130-137).

█   ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████   ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████   ██████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████   ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████



## III.    The Requested Sentence

Popp was among the most culpable participants in a horrific crime that seriously hurt and continues to haunt the Victims.  She is clearly not Jim Baugh—the campaign's architect and driving force—but Popp's GSR is nevertheless appropriately high.  Like Baugh, she participated in every part of the harassment and intimidation campaign and knew both its full extent and the effect that it was having on its "rattled" Victims.  Like Baugh, she had significant roles in both aspects of the separate crime that followed:  the obstruction of the NPD and the eBay internal investigations.  Where others might argue that Baugh compartmentalized his campaign, and that

---

[4] In the plea agreement, the government agreed to a two-level variance below Popp's GSR of 51 to 63 months.  It intended this variance to account for a three-level enhancement that Popp agreed to as a manager or supervisor of the conspiracy (in comparison to a four-level enhancement that Baugh received as the organizer-leader).  In the government's view, the three levels overstated Popp's supervisory role relative to Baugh's.

they did not know about the threatening messages or the harassing deliveries or the surveillance—or that they obstructed eBay but not police investigators—Popp cannot. By virtue of her involvement, her position as Baugh's de facto chief of staff, and her close professional relationship with Baugh, Popp knew as much as anyone else about the extent of the conspiracy.

Just as clearly, there are mitigating factors that cause the government to recommend a sentence of 1 year and 1 day— ████████████████████████████████

████████   These factors include ████████████████████████████████ (2) the disparity in professional experience between Baugh, Harville, Cook, and Gilbert on the one hand and Popp, Stockwell, and Zea on the other; and (3) the intense loyalty that Popp felt toward Baugh as a professional mentor.

Even giving significant weight to these mitigating factors, Popp still deserves a custodial sentence. It is necessary to distinguish her from clearly less culpable defendants with even less professional experience (in Stockwell and Zea), while recognizing factors that distinguish Popp from Baugh, Harville, Gilbert, and Cooke.

*Nature and Circumstances of the Offense*

The terror the Victims experienced as a result of the defendants' harassment and intimidation campaign is plain from the Victims' Impact Statements. (PSR at pp. 46-54). The unimaginably cruel deliveries, threats, and surveillance were not simply late-night hijinks. Each amplified the next and predictably impacted the Victims, who experienced the defendants' conduct physically. Victim 1 describes having trouble breathing and losing both weight and sleep. In the wake of the August 16 surveillance, Victim 2 appeared nauseous to his wife— sweating and without any color in his face. Victim 1 was afraid that her husband of 31 years was going to have a heart attack right in front of her.

Beyond the visceral response the defendants caused, the offense also impacted Victims 1 and 2 professionally and financially.  Victim 1 went from being a reporter and expert on ecommerce to being an "eBay critic".  When she is contacted online—by a potential source or an eBay seller—Victim 1 now wonders if someone involved in their harassment (or inspired by it) is back at it.  Popp and her co-conspirators' conduct has diminished the Victims' ability to do their jobs.

Victim 2, for his part, laments the impact the defendants' crimes had on the Newsletter's business.  He describes in his Victim Impact Statement necessary and painful steps that have affected the couple's future income potential—the financial legacy of the defendants' harassment and intimidation campaign.

 As cyberstalking frequently does, the offense also cut the Victims off from their communities.  Victim 1 was afraid to go out in public.  Concerned neighbors were coming by asking about the strange behavior outside their home.  The Victims cancelled social engagements and a trip to see family and friends out of town, fearful that their stalkers would follow, and become others' stalkers.  They even turned away offers of help and places to stay, afraid of putting well-meaning friends at risk.  Until the NPD put an end to the campaign, the Victims experienced it alone.

Nor has their fear abated with time.  More than three years later, the Victims continue to memorize car license plates in public, carry pepper spray outside their home, and remain alert for signs of unusual activity in their neighborhood.  Victim 2 relates sleepless nights, anxiety, anger, depression, and insecurity about the couple's future.  The defendants' crime has sadly changed the way the Victims see the world.

It is also troubling that Baugh, Popp, Cooke, and Gilbert targeted the Victims for what

they had written and published ("I don't want to see another fucking post about ebay"), and for making space for others to publish comments beneath the Newsletter's articles. Journalism about public companies, especially the world's largest ecommerce brands, is important to investors, merchants, and customers alike. That Baugh's group targeted the Victims based on his and others' disagreement with the Newsletter's coverage is abhorrent to First Amendment values.

Finally, Popp's offense is more serious because she willfully obstructed justice. A police investigation was a logical moment to reset. Popp along with her co-conspirators regrettably doubled down.

*General Deterrence*

Popp does not need to be individually deterred. The government is confident that she will not re-offend. The requested custodial sentence will nevertheless promote deterrence. Every large company in the United States has a security department. Most of these companies get critical press from time to time; have detractors online; and—like eBay—will be the object of unflattering (and likely profane) comments. Companies value their corporate images, and with good reason track the public's perception of them. But companies and their security organizations are not law enforcement agencies. Security and "brand protection" are not the same. Senior employees at public companies cannot run "ops" against people who say things they dislike on the internet. They cannot engage in illegal self-help instead of reporting a perceived threat to law enforcement, or using the courts to seek relief. The requested sentence will reinforce the difference between actual corporate security and what happened in this case.

Despite their relative youth, inexperience, and time working in Baugh's Alice-in-Wonderland version of a corporate security department, Analyst 1 and Analyst 2 walked away

13

from Baugh as the campaign and obstruction escalated.   Mid-level corporate employees like

Popp should know that they will not avoid jailtime because a co-conspirator who ordered up

serious crimes was trusted, or experienced, or an advocate in many other professional respects.

Every corporate defendant will otherwise invariably point the finger elsewhere.

*Mitigating Factors*

Popp did not have a 20-year career in law enforcement, as Gilbert and Cooke did.   Popp

did not have experience working with the U.S. government, as Baugh did.   She had no

experience supervising a unit of military police officers (Harville), and her experience in

corporate security paled in comparison to both Baugh and Harville, who had each worked in the

field for decades.   Throughout the conspiracy, these men committed and commissioned criminal

acts while purporting to draw lines between right and wrong.   This disparity of power and

experience tempers Popp's wrong, even if it does not eliminate it.

The same is true of Popp's relationship with Baugh.   Baugh gave Popp entrée to eBay

and elevated her to a six-figure salary as the manager of the GIC.   ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Popp agrees today that she should not have gone "all in" for Jim Baugh, but the history between

the two makes it marginally more understandable why she did.

These are factors that counsel a lower sentence, even if the government does not agree

that they eliminate the need for a custodial sentence.

*Similarly Situated Defendants*

The nature of Popp's conviction ████████████ limit the utility of analyzing national sentencing trends.  It is a safe bet that there are few seven-defendant corporate cyberstalking cases.  Within this District, most stalkers have been current or former intimate partners or lone actors.  What national, circuit and local statistics do say is that, ████ ████████ cases sentenced under § 2A6.2 command significant sentences.  For the fiscal years 2015 through 2021, in 359 cases nationwide where courts imposed prison sentences using USSG § 2A6.2—the primary Guideline in this case—the average length of imprisonment was 39 months.  In the First Circuit, 15 such cases similarly led to an average length of imprisonment of 35 months.  For five cases in this District, the average was 30 months. https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited Sept. 21, 2022).  ████████████ ████████████████████████████████ the recommended sentence for Popp is consistent with these norms.[5]

*Relative Culpability*

A sentence of 1 year and 1 day strikes a correct middle ground.  Baugh's conduct and leadership earned him each of the 57 months he will serve.  Harville (24 months), Cooke (18 months), and Gilbert (a GSR of 30 to 37 months) each earned (or should earn) a significant jail term by virtue of their police or government service, training, and experience, even though none

---

[5]Popp draws an inapt comparison to the *Varsity Blues* sentencings that have taken place in this District.  To a case, they all involved non-violent crimes affecting legal entities (with no harm to a natural person akin to the Victims in this case).  The differing nature of the offenses is reflected in their lower offense levels:  Repella and Isackson had GSRs of 0 to 6 months; Dvorskiy's was 21 to 27 months.  Isackson, Janke, and Khosroshahin testified at one or two trials, ████████████████████████████████

of them engaged in the conspiracy as fully as Popp did.[6]   Popp, ███████████████ deserves additional sentencing consideration based on her relative inexperience and her relationship with Baugh.  Stockwell and Zea, in turn, are undisputedly less culpable than Popp and held even less power in Baugh's organization as its most junior employees.  Further beneath Stockwell and Zea are the uncharged Analysts 1 and 2, who quit and got fired rather than do what Baugh asked.  Taking all of Popp's aggravating and mitigating factors into account, she should fall right in the middle of these outcomes:  a modest but meaningful term of imprisonment—one that will likely end after 10 months (assuming good time credit) and that could see her placed in a residential reentry center even sooner through the First Step Act.

---

[6]Gilbert, Cooke, and Harville did not participate in the harassing deliveries.  Harville did not participate in the harassing messages.  Gilbert and Cooke were not involved in the surveillance.  Cooke and Gilbert obstructed the NPD investigation, but they did not lie to eBay investigators.  Harville obstructed the eBay investigators, but did not lie to the NPD.

## IV.      Conclusion

For all of these reasons, the United States respectfully requests that the Court impose a sentence of one year and one day in BOP custody; supervised release of one year to follow; and a special assessment of $200.  Based on Popp's financial condition, the government does not seek the imposition of a fine.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

by:/s/Seth B. Kosto
SETH B. KOSTO
Assistant U.S. Attorney
One Courthouse Way
Boston, Massachusetts 02210

October 7, 2022
Boston, Massachusetts

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this sealed motion for downward departure was

sent by electronic mail message to counsel for the defendant on October 6, 2022.

*/s/Seth B. Kosto*
SETH B. KOSTO
Assistant U.S. Attorney

Boston, Massachusetts
October 7, 2022